Barry BRAZIL, et al., Plaintiffs,

v.

**ARKANSAS BOARD OF DENTAL EXAMINERS, et al., Defendants.**

No. LR–C–81–675.

United States District Court,
E.D. Arkansas, W.D.

April 6, 1984.

Ron Bruno, Little Rock, Ark., for plaintiffs.

William H. Trice, III, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, Chief Judge.

In this action plaintiffs seek injunctive relief and damages for alleged violations of section 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1976), as well as alleged violations of their rights under the first, fifth, ninth and fourteenth amendments to the United States Constitution. At issue before the Court are the defendants' motions to dismiss the antitrust claims. For the reasons set forth below, the motions will be granted in part and denied in part.

### I. *Facts*

#### A. *Parties to the Litigation*

Six plaintiffs have joined in filing a complaint against the Arkansas State Board of Dental Examiners, the Arkansas State Dental Association, and various members and officers of such groups. Plaintiffs contend that the defendants have conspired to restrain trade in the provision of certain dentistry-related services.

Plaintiff Barry Brazil owns and operates a dental laboratory, the American Denture Center, which constructs, repairs, reproduces, duplicates and processes dentures. Mr. Brazil claims he is qualified to and does carry out these functions and asserts he has more training and experience in the field than most practicing dentists. Mr. Brazil is not a dentist, *see Brazil v. Arkansas State Board of Dental Examiners*, 279 Ark. 41, 41 648 S.W.2d 476 (1983). Instead, he claims that by performing the above-mentioned functions he is a "denturist".

Plaintiff Patsy Brazil is Mr. Brazil's wife and executive secretary of the American

Denture Center. The pleadings do not indicate whether she directly works with dentures.

Plaintiff Neil Hinsley is a dentist, who has been licensed to practice dentistry by the State of Arkansas. His office is or has been located on the same premises that house the American Denture Center.

The remaining three plaintiffs, Georgia and John Stahn and Carol Ann Bender are residents of Arkansas who allegedly have utilized the services of the American Denture Center because of cost and performance factors. They claim that if denied access to the services of the American Denture Center they "would be forced to incur far greater expense for [dental] services."

The complaint names fifteen defendants. The first is the Arkansas State Board of Dental Examiners ("Dental Board"). As will be discussed in greater detail *infra,* the Dental Board is a legislatively-created state agency charged with the duty of regulating the practice of dentistry. Mr. L.D. Redden has also been sued in his individual capacity and his official capacity as a member of the Dental Board, as have Dental Board members J.D. Atkinson, Taylor D. Buntin, Jr., Paul Fitzgerald, Earl Gill, Fallon D. Davis and Patsy C. Farris.

Also named as a defendant is the Arkansas State Dental Association ("Association"), a not-for-profit Arkansas corporation whose membership consists of dentists. The Association is a statutorily recognized organization that is vested with the duty of recommending to the Governor of Arkansas the names of dentists to be appointed to the Dental Board. Six of the Association's officers, Charles Finley, Don H. Barrow, L.V. Clement, Tommy G. Roebuck, George E. Gillian, and R.L. Smith, Jr., are sued individually and in their official capacities as officers of the Association.

## B. *Allegations Raised in the Case*

Plaintiffs' sixteen-page Amended Complaint raises an amalgam of constitutional and Sherman Act claims, which may be summarized as follows:

First, the Board and the Association have sought to protect the economic interests of dentists by requiring any procedure undertaken in a dental laboratory to be accompanied by a work order signed by a licensed dentist.

Second, that the State, the Board and the Association have prohibited dentists from being employed by dental laboratories or being engaged in an ownership capacity in the operation of dental laboratories with non-dentists.

Third, that the Board has expanded the definition of "the practice of dentistry" by promulgating rules that prohibit anyone other than a licensed dentist from making impressions for dentures.

Fourth, that certain restrictions applicable to the plaintiffs, which were established only after the plaintiffs started advertising their services, were designed to harass and intimidate the plaintiffs. In a related claim, plaintiffs assert that the Board has launched a campaign against the plaintiffs to drive them out of business. They cite numerous cases brought by the Board against several of the plaintiffs as examples of such harassment tactics.

Fifth, plaintiffs allege what might possibly be construed as an equal protection claim in connection with litigation instituted by the Board against several of the plaintiffs. Specifically, they claim that they have been singled out for prosecution for alleged violations of Ark.Stat. Ann. § 72–545 while other operators of dental laboratories, which are owned by dentists, have not been sued even though they have engaged in activities that are identical to those of the plaintiffs.

Sixth, the plaintiffs challenge the rule-making powers of the Dental Board. They specifically seek to enjoin enforcement of several rules adopted by the Board that prohibit the issuance of permits to providers of dental services unless the providers are entirely owned by licensed dentists. Plaintiffs also challenge the Board's rule that any licensed dentist who associates and advertises

with unlicensed dental associations is guilty of unprofessional conduct. Plaintiffs assert that by taking these actions the defendants are attempting to monopolize the marketing and distribution of dental care services and in doing so have infringed upon the plaintiffs' rights to contract with licensed dentists.

Seventh, the plaintiffs challenge several rules adopted by the Board as unreasonable, arbitrary and capricious. They assert that the Rules are tainted heavily by the fact that all of the defendant members of the Board have a financial interest in restricting the opportunities of denturists to practice.

## C. *Nature of Plaintiffs' Antitrust Claims*

Plaintiffs' antitrust claims are premised on Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Section 1 states in pertinent part:

Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ....

Section 2 states:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

The central thrust of plaintiffs' antitrust allegations appears to be that the Dental Board has conspired with the Dental Association to restrain denturists from providing dental-related services to the public. The defendants have allegedly done so by adopting and enforcing rules that restrain the activities of denturists and that prohibit denturists from associating with licensed dentists. Plaintiffs assert that such ac-

tions undertaken by the defendants are motivated by an attempt to monopolize the provision of dental services in the State of Arkansas. Plaintiffs also assert that by restricting denturists from freely practicing the defendants have attempted to fix, control and raise the price of dental services.

Defendants have all moved to dismiss the antitrust claims on the grounds that they are immune from antitrust liability under the "state action" doctrine. Due to the different status of the individual defendants, the Court will address their arguments separately.

## II. *State Action Immunity as Applied to the Dental Board*

The Dental Board claims that it is immune from antitrust scrutiny because all of the actions it has undertaken arise out of its function as a state agency. Thus, the Dental Board asks the Court to hold in its favor on the basis of the "state action" doctrine. The Court observes at the outset that, although the "state action" doctrine dates back to 1943, it has recently undergone considerable re-appraisal and refinement. To understand the applicability of the doctrine in this case, it is therefore necessary to trace the development of the doctrine.

## A. *Development of the "State Action" Doctrine*

The genesis of the doctrine is *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), where the Supreme Court announced that Congress did not intend for the Sherman Antitrust Act to apply to "state action." At issue in *Parker* was the propriety of a California agricultural commodity marketing program administered by the State Director of Agriculture, members of the State Agriculture Prorate Advisory Commission, and others. As designed, the program restricted competition and provided a system of price maintenance in the sale of locally-grown raisins. A producer and packer of raisins brought suit under the Sherman Act against the various enti-

ties who administered the program to enjoin them from enforcing it. The Supreme Court denied the relief sought. The Court determined that in implementing and enforcing the program, the administrators were simply carrying out "an act of government." *Id.* at 352, 63 S.Ct. at 314. Although it unquestionably imposed a restraint on trade, the program constituted the sovereign exercise of state power "which the Sherman Act did not undertake to prohibit." *Id.* Thus, the Supreme Court recognized a rather significant limitation to the reach of the Sherman Act.

The Supreme Court had little occasion to confront the issue again until 1975, when it addressed the Sherman Act's applicability to a minimum-fee schedule for lawyers that had been published by a county bar association and enforced by the Virginia State Bar. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Virginia State Bar asserted it was cloaked with immunity from scrutiny under the antitrust laws because it was "a state agency by law." *Id.* at 790, 95 S.Ct. at 2014. The Supreme Court disagreed. It did observe that the Virginia Legislature had explicitly vested regulatory authority over the practice of law in the Supreme Court of Virginia and had empowered the State Bar to exercise some ancillary authority in its capacity as an administrative arm of the Virginia Supreme Court. But the Court also noted that since neither the Legislature nor the Virginia Supreme Court had articulated any policy regarding minimum fee schedules, the state had never actually exercised *its* sovereign power to compel restraints on competition. To the extent that the Virginia State Bar had fixed prices without being compelled to do so by the state, it had emerged from behind the state's shield of immunity and therefore had subjected itself to Sherman Act liability.

Close at the heels of *Goldfarb* came two other Supreme Court decisions that further delineated the scope of the state action doctrine. The first, *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), focused on the applicability of the state action doctrine to a clearly private, but state-regulated entity—an electric utility. Under the terms of a tariff proposed by the utility, but approved by the Michigan Public Service Commission, the cost of light bulbs was included in the basic rate for electricity charged by the utility. A local retailer of light bulbs complained that by providing its electricity customers with free supplies of light bulbs, the utility was simply using its monopoly power in the distribution of electricity to restrain competition in the market for light bulbs.

The utility attempted to invoke the "state action" doctrine, claiming that since the tariff filed with the Commission included the light bulb distribution program, in effect, state law required it to maintain the program so long as the tariff was in effect. The Supreme Court rejected the argument. In addition to finding that no state statute regulated the light bulb industry, the plurality opinion observed that the Legislature had not passed upon the desirability of the program. And although the utility could not have maintained or abandoned the program without the Commission's approval, "the option to have, or not to have such a program [was] primarily the [utility's], not the Commission's." *Id.* at 594, 96 S.Ct. at 3119 (footnote omitted). Thus, the Commission's approval of the utility-authorized tariff, which included the light bulb program, did not actually "implement any statewide policy relating to light bulbs." *Id.* at 585, 96 S.Ct. at 3115. Its position, and therefore the state's, was one of acquiescence, not compulsion.[1]

The next case in the sequence of Supreme Court "state action" decisions—

---

**1.** The distinction raised by the *Cantor* plurality therefore seems to accord to that articulated in *Goldfarb:* for the anticompetitive acts of private entities to escape antitrust liability, "[i]t is not enough that ... anticompetitive conduct is prompted by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." 421 U.S. 773, 791, 95 S.Ct. 2004, 2015.

*Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)—signalled the continuing vitality of the basic *Parker* doctrine. In *Bates,* two licensed attorneys had run afoul of rules promulgated by the Arizona State Supreme Court that prohibited certain attorney advertising. Subjected to disciplinary proceedings by the Arizona State Bar, the attorneys challenged the advertising ban on the grounds that the Sherman Act proscribed such restraints on trade. The United States Supreme Court found, however, that the attorneys' antitrust claims, though nominally lodged against the state bar association, were more properly conceived of as implicating the interests of the State. The Court stated:

> Here, the appellants' claims are against the State. The Arizona Supreme Court is the real party in interest; it adopted the rules, and it is the ultimate trier of fact and law in the enforcement process. * * * Although the State Bar plays a part in the enforcement of the rules, its role is completely defined by the court; the appellee acts as the agent of the court under its continuous supervision.

*Id.* at 350, 97 S.Ct. at 2691. The Court concluded that the advertising ban, which stemmed from the "affirmative command of the Arizona Supreme Court," *id.* at 360, 97 S.Ct. at 2697, and its enforcement by the state bar were therefore governmental acts of the state. As such they fell outside the panoply of the Sherman Act.[2]

Since *Bates,* the Court has confronted the state action immunity question in a number of different contexts. Two of those cases, *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), and *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), addressed the applicability of the state action defense to anticompetitive acts carried out by municipalities. In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), and *New Motor Vehicle Board of California v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), the Court returned to the arena of actions by private entities which, like the utility in *Cantor,* claim immunity because their acts were somehow intertwined with state policies and programs. These decisions have settled some questions, yet they have raised others.[3] It is fair to say that the "state action" issue remains in the developmental stage.

### B. *Current Status of the "State Action" Doctrine*

Nevertheless, the dust has settled enough to venture certain conclusions about "state action" immunity. The Sherman Act appears to place few, if any, strictures on the activities of a state's legislature in enacting anticompetitive legislation.[4] *See New Motor Vehicle Board,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978). The same is true of certain acts of a state's highest court. *See Bates,* 433 U.S. at 359–60, 97 S.Ct. at 2696–97. Yet freedom from Sherman Act scrutiny does not necessarily flow to *private* entities who claim "state action" immunity by asserting some tie-in to state-regulated activity. *Cantor,* discussed *supra,* set the tone for the analysis applied when private entities claim immunity because their acts are somehow intertwined with state policies and programs: mere acquiescence to the challenged activity by the state is insufficient to justify application of the state action doctrine. In-

---

2. The Court did, however, find that the attorneys were entitled to relief on a related first amendment issue.

3. *See, e.g., Community Communications,* 455 U.S. at 51 n. 14, 102 S.Ct. at 841 n. 14 (refusing to decide whether anticompetitive acts by a municipality must meet the "active state supervision" test announced in *Midcal*).

4. *But see Rice v. Norman Williams Co.,* 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982) (state statute may be *preempted* by the Sherman Act "if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.").

stead, the state must articulate some policy that the private anticompetitive acts somehow promote. This point emerged most vividly in *Midcal,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). *Midcal* suggests that private entities *could* conceivably claim the benefit of state action immunity, but only if their acts can meet two stringent tests: first, the restraint must be "clearly articulated and affirmatively expressed" as state policy; and second, the state must "actively supervise" the anticompetitive activity.

Several decisions involving cases analogous to the one at bar have employed the *Midcal* analysis when evaluating restraints on competition imposed by state instrumentalities similar to the Arkansas Dental Board. For example, the Ninth Circuit in *Ronwin v. State Bar of Arizona,* 686 F.2d 692 (9th Cir.1981), *cert. granted,* 461 U.S. 926, 103 S.Ct. 2084, 77 L.Ed.2d 296 (1983), held that a committee appointed by the Arizona Supreme Court to grade bar examinations could claim state action immunity only if its acts were "actively supervised" by the state. Similarly, the Sixth Circuit's nearly indistinguishable case, *Gambrel v. Kentucky Board of Dentistry,* 689 F.2d 612 (6th Cir.1982), *cert. denied,* 459 U.S. 1208, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983), implemented the "active supervision" prong of the *Midcal* test in evaluating the right of the Kentucky Board of Dentistry to establish and enforce restrictions on dental work performed by dental technicians. *See* discussion of *Gambrel, infra.*

■ These cases have apparently ignored the existence of a third form of state action analysis that applies to state agencies and other state instrumentalities (such as municipalities). To be sure, *Parker* did *not* hold "that all governmental entities,

whether state agencies or subdivision of a State, are, simply by reason of their status as such, exempt from the antitrust laws." [5] *City of Lafayette v. Louisiana, Power & Light Co.,* 435 U.S. 389, 408, 98 S.Ct. 1123, 1134, 55 L.Ed.2d 364 (1978). Yet *Parker* and its progeny have recognized that actions of state agencies and municipalities may stem from state policies designed to quell competition. If such a nexus exists, then the acts of the agency or municipality take on the aura of state action and therefore evade antitrust scrutiny. The key to gaining such immunity is governmental authorization: it must be shown that the anticompetitive acts of the state agency or municipality were taken "in furtherance or implementation of clearly articulated and affirmatively expressed state policy." *Community Communications,* 455 U.S. at 52, 102 S.Ct. at 841; *First America Title Co. of South Dakota v. South Dakota Land Title Ass'n,* 714 F.2d 1439, 1451 (8th Cir.1983), *cert. denied,* ___ U.S. ___, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

■ The "authorization" required for state agencies and municipalities need not rise to the level of explicit compulsion. *Id.* at 1012 n. 11. Indeed, as *City of Lafayette* observed, it is sufficient "that the legislature contemplated the kind of action complained of." 435 U.S. at 415, 98 S.Ct. at 1138 (quoting opinion below, *City of Lafayette v. Louisiana Power & Light Co.,* 532 F.2d 431, 434 (5th Cir.1976)).[6] Similarly, evidence of intent to displace competition need not be derived from explicit legislative pronouncement; rather, it may be inferred "if the challenged restraint is a necessary or reasonable consequence of engaging in the authorized activity." *Gold Cross Am-*

---

5. Moreover, even if certain acts of a state agency might deserve antitrust immunity under the "state action" theory, it does not necessarily follow that "every act of a state agency is that of ther State as sovereign." 435 U.S. at 410, 98 S.Ct. at 1135 (emphasis added). If the agency or municipality transgresses the bounds of its authority to establish trade restraints, *Parker* immunity will not attach.

6. *See also Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 381 (7th Cir.1983), *petition for cert. filed,* ── U.S. ──, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1983) (if "the state gave the city authority to operate in the area of sewage services and to refuse to provide treatment services then we can assume that the State contemplated that anticompetitive effects might result from conduct pursuant to that authorization.").

*bulance & Transfer v. City of Kansas City,* 705 F.2d 1005, 1013 (8th Cir.1983).

The test for gauging the propriety of regulatory activities carried out by state agencies and municipalities should not be confused with the relatively more stringent standard reserved for private entities in *Midcal. See First American Title Co.,* 714 F.2d at 1452. First, the state legislature need not explicitly compel anticompetitive regulation: it is sufficient if the authority bestowed upon the governmental entity suggests that the legislature contemplated that the entity might invoke such authority to restrain trade. *Id.* at 1451; *Town of Hallie v. City of Eau Claire,* 700 F.2d at 381. As one observer has aptly noted:

> Immunity for decision of subordinate agencies or officials cannot depend on an explicit command from the legislature; delegation of governmental powers necessarily includes the discretion to make decisions not compelled by the legislature.

Areeda, *Antitrust Immunity for "State Action" After Lafayette,* 95 Harv.L.Rev. 435, 445 n. 49 (1981).

Second, the "active supervision" requirement articulated in *Midcal* simply has no application in the context of traditional anticompetitive acts attributed to agencies and municipalities. *Gold Cross* is instructive on this point:

> The Supreme Court has required active state supervision of the challenged restraint only in cases in which the defendants were private entities or individuals. * * * In this context, the state supervision requirement is intended to control the potential for abuse created by authorizing private persons to make anticompetitive decisions and to insure that those decisions are consistent with the clearly articulated and affirmatively expressed state policy at stake. Because municipal officials generally are politically accountable to the citizens they represent for their decisions regarding the challenged restraint, *state supervision is*

*not as necessary to prevent abuse* as in the private context. * * *

Moreover, because the *Parker* doctrine requires that the state delegate to the local government the authority to engage in the challenged conduct, state supervision of Kansas City's conduct is unnecessary to find state action. * * * As a leading commentator recently noted:

> requiring state authorization for local conduct is analogous to requiring active supervision of private conduct; it tests whether challenged local activity is truly state action and therefore entitled to immunity.

705 F.2d at 1014 (emphasis added) (quoting Areeda, *Antitrust Law* ¶ 212.2a, at 47 (1982 Supp.) (footnote omitted)). *See also Golden State Transit Corp. v. City of Los Angeles,* 726 F.2d 1430, 1434 (9th Cir.1984); *Central Iowa Refuse Systems, Inc. v. Des Moines Metropolitan Solid Waste Agency,* 715 F.2d 419, 428 (8th Cir.1983) (supervision unnecessary where "the restraint represents governmental conduct in an area of traditional municipal activity."); *First American Title Co.,* 714 F.2d at 1451 n. 13; *Town of Hallie,* 700 F.2d at 383–85.

## C. *The Merits of the Dental Board's Claim*

With this analytical framework in mind, the Court can now turn to the merits of the Dental Board's claim to state action immunity. At the outset, the Court observes that under Arkansas statutes, the Dental Board is designated to serve as the state's administrative adjunct for purposes of regulating the dental profession. *See* discussion of statute *infra.* Indeed, the Arkansas Supreme Court has described the Board as "an arm of the people of Arkansas." *Baxter v. Arkansas State Board of Dental Examiners,* 269 Ark. 67, 77, 598 S.W.2d 412 (1980). The Court must therefore conclude that the Dental Board is a "state agency" for purposes of "state action" immunity analysis.[7] *Cf. Gambrel v. Kentucky Board of Dentistry,* 689 F.2d 612, 618 n. 2 (6th Cir.1982), *cert. denied,*

---

**7.** Plaintiffs apparently concede this point. *See*   complaint, part III(7).

459 U.S. 1208, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983) (Kentucky Board of Dentistry deemed a "state agency" entitled to "state action" immunity).

Thus construed as a "state agency," the Court need not invoke the *Midcal* analysis for ascertaining whether the State has "compelled" and "actively supervised" the actions taken by the Dental Board. Instead, it is sufficient if the General Assembly authorized the challenged activities and did so with an intent to displace competition. As stated *supra*, to meet this test the Board must show that, considering the powers vested in the Board, the General Assembly must have "contemplated" the Board's challenged regulatory activities, and that the restraints emanating from such activities are necessary or reasonable outgrowths of the Board's engaging in those regulatory activities.

Do the Dental Board's actions fall within the state action immunity doctrine? The Court is convinced they do.

1. *State's Long Tradition in Regulating Dentistry*

■ First, Arkansas' long history of regulating the practice of dentistry, which predates the Twentieth Century, supports an application of state action immunity doctrine to the Dental Board's activities.[8] In 1887, the Arkansas General Assembly enacted legislation that prohibited the practice of dentistry by anyone who had not received state certification. Administrative authority to provide such certification was vested in a Board of Dental Examiners. *See* Act of April 4, 1887. Two years after the Act's enactment, it received its first scrutiny by the Arkansas Supreme Court in *Gosnell v. State*, 52 Ark. 228, 12 S.W. 392 (1889), and it and subsequent statutes regulating dental practice have weathered a number of legal challenges.[9]

2. *Current Statutory Regulation of Dentistry*

■ Subsequent enactments have established a more comprehensive and, arguably more intrusive, scheme of regulation on the dentistry profession. The present statute, the Arkansas Dental Practice Act, Ark.Stat.Ann. §§ 72–534 to 570 (1979 Repl. and 1983 Supp.) dispels any doubt that the State of Arkansas intends to regulate the profession and to restrain those who fail to heed the statutes and regulations. *See Missionary Supporters Inc. v. Arkansas State Board of Dental Examiners*, 231 Ark. 38, 328 S.W.2d 139 (1959).

a. *Restriction on the Practice of Dentistry*

The statute broadly defines "practice of dentistry" and bans any such practice by

---

**8.** *See Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 275 n. 6 (9th Cir.1982).

**9.** In *Gosnell,* the court sustained the constitutionality of the Act in the face of a challenge by one who had been convicted and fined for practicing without proper certification from the Dental Board. Since *Gosnell,* the Arkansas Supreme Court has upheld the regulatory scheme for dentistry against allegations that, by restricting practice to licensed dentists, it violates the first and fourteenth amendments to the United States Constitution. *See Missionary Supporters, Inc. v. Arkansas State Board of Dental Examiners,* 231 Ark. 38, 328 S.W.2d 139 (1959). Indeed, as recently as 1982, the Court rejected allegations that an unlicensed "denturist" was denied due process and equal protection by virtue of the Act's implementation by the Board. *Hulva v. Arkansas State Bd. of Dental Examiners,* 277 Ark. 397, 642 S.W.2d 296 (1982). *Hulva* also rejected contentions that the Act improperly delegated legislative power to the Board. *Id.* at 400, 642 S.W.2d 296.

The history of court activity involving the Act is punctuated even by decisions involving two of the plaintiffs in this case. In *Hinsley v. Arkansas State Bd. of Dental Examiners,* 276 Ark. 243, 633 S.W.2d 696 (1982), the Arkansas Supreme Court vacated disciplinary sanctions imposed against plaintiff Neil Hinsley on the grounds that the regulations under which he had been charged were not in effect at the time of the alleged violations. In *Brazil v. Arkansas State Bd. of Dental Examiners,* 279 Ark. 41, 648 S.W.2d 476 (1983), the Supreme Court upheld a contempt-of-court finding against plaintiff Barry Brazil after he violated an injunction previously entered against him due to violations of the Act's provisions regarding unauthorized practice of dentistry and improper advertising.

persons not licensed by the state.[10] §§ 72–543, 72–540. The statute regulates dental practice advertising, § 72–544, and prohibits the sale of dental articles to the public by any person other than a licensed dentist. § 72–545. *See Hulva v. Arkansas State Board of Dental Examiners*, 277 Ark. 397, 642 S.W.2d 296 (1982). The statute also restricts the sale of dental articles by non-licensed persons to licensed dentists. § 72–545. Moreover, it establishes significant restrictions on the forms of business under which a dentist or dental hygienist may practice. § 75–559.

### b. *The Dental Board's Statutory Authorization*

Prime responsibility for carrying out, enforcing and elaborating upon the statutory provisions is vested in the Dental Board. The statute empowers the Board to promulgate rules and regulations "to carry out the intent and purposes" of the Act. § 72–537.1. It expressly makes the Board the licensing authority for all seeking to practice dentistry and dental hygiene. § 72–540. It empowers the Board to elaborate, through regulation, on the statutory definition of "practice of dentistry."[11] § 72–543. The statute also enables the Board to regulate advertising and to adopt rules and regulations related thereto. § 72–544. To enforce the provisions of the Act, the Board is given the power to issue subpoenas and to conduct hearings regarding matters within its realm of authority, § 72–537. As a corollary, the Board is empowered to revoke, suspend, or place on probation any licensed dentist or dental hygienist for numerous reasons, including violations of ethical standards of conduct, improper advertising, using patient solicitors, and permitting unlicensed persons within their supervision to practice dentistry. *See Brazil v. Arkansas State Board of Dental Examiners*, 279 Ark. 41, 648

S.W.2d 476 (1983); *Baxter v. Arkansas State Board of Dental Examiners*, 269 Ark. 67, 598 S.W.2d 412 (1980). Moreover the Board may seek to enjoin any person who practices dentistry or dental hygiene in violation of the Act. § 72–542. *See Brazil*, 279 Ark. at 41; *Hulva v. Arkansas State Board of Dental Examiners*, 277 Ark. 397, 642 S.W.2d 296 (1982) (injunction against unlicensed maker of dentures).

### 3. *Intent to Restrict Competition*

■ The State has also clearly evinced an intent to restrict competition in the practice of dentistry. As stated above, the statute establishes a system of licensure for the practice of dentistry: non-licensed practitioners are categorically precluded from the field. § 72–543. In this connection, the Board has the power to revoke and suspend licenses and to sue in the courts to enjoin the unauthorized practice of dentistry. The statute also closely regulates dental advertising, and has empowered the Dental Board to promulgate rules and enforce the statute. § 75–544. Intent to restrain pure competition appears also in the statute's restrictions on the sale of dental articles to the public, as well as in its enumeration of procedures that must be followed when non-licensed purveyors of dental products, such as dentures, deal with licensed dentists. § 72–545.

The Arkansas General Assembly's intent to restrict trade competition in the dentistry field is also evident in the Dental Corporation Act, Ark.Stat.Ann. §§ 64–1801 to 1817 (1980 Repl.). Although not banned outright, practice of dentistry in the corporate form is significantly restricted under the Act.[12] For example, the statute allows *only* licensed dentists to incorporate for purposes of owning, operating or maintaining a business devoted to dental practice:

---

**10.** The ban is backed by civil and criminal sanctions. *See* § 72–541.

**11.** Such rules and regulations must be adopted in compliance with the Arkansas Administrative Procedure Act, Ark.Stat.Ann. §§ 5–701 et seq., and they are subject to judicial review. *See* 72–543. *See also Baxter v. Arkansas State Bd. of*

*Dental Examiners*, 269 Ark. 67, 598 S.W.2d 412 (1980).

**12.** This provision apparently supersedes that provision of § 72–559, which prohibits any corporation from practicing dentistry or dental hygiene.

**64–1802. Formation of corporation— Purpose.**—One (1) or more persons licensed pursuant to the Arkansas Dental Practice Act [§§ 72–534—72–570] may associate to form a corporation pursuant to the Business Corporation Act [§ 64–101 et seq.] to own, operate and maintain an establishment for the study, diagnosis and treatment of dental ailments and injuries, and to promote dental and scientific research and knowledge; provided, treatment, consultation or advice may be given by employees of the corporation only if they are licensed pursuant to the Dental Practice Act.

Thus, non-licensed persons may not form a dental corporation whether they seek to do so individually, with other non-licensed persons or with licensed persons.

The Act also makes it clear that non-licensed persons may not serve as officers, directors or shareholders of any dental corporation and, in fact, may not participate in the management of such a corporation:

**64–1814. Officers, directors and shareholders—Qualification.**—All of the officers, directors and shareholders of a corporation subject to this act [§§ 64–1801—64–1817] shall at all times be persons licensed pursuant to the Dental Practice Act [§§ 72–534—72–570]. No person who is not so licensed shall have any part in the ownership, management, or control of such corporation, nor may any proxy to vote any shares of such corporation be given to a person who is not so licensed.

The Act also directly injects the Dental Board into the regulation of dental corporations. Any dental corporation must obtain certification from the Dental Board before it may operate:

**64–1805. Certificate of registration required — Application — Issuance — Fee.**—No corporation shall open, operate or maintain an establishment for any of the purposes set forth in section 2 [§ 64–1802] of this act without a certificate of registration from the Arkansas State Board of Dental Examiners. Application for such registration shall be made to

said Board in writing and shall contain the name and address of the corporation and such other information as may be required by the Board. Upon receipt of such application, the Board shall make an investigation of the corporation. If the Board finds that the incorporators, officers, directors and shareholders are each licensed pursuant to the Dental Practice Act [§§ 72–534—72–570] and if no disciplinary action is pending before the Board against any of them, and if it appears that the Corporation will be conducted in compliance with law and the regulations of the Board, the Board shall issue a certificate of registration.

Moreover, the Board is empowered to suspend or revoke any certificate of registration based on any of several grounds:

**64–1810. Suspension or revocation.**—The Arkansas State Board of Dental Examiners may suspend or revoke any certificate of registration for any of the following reasons: (a) the revocation or suspension of the license to practice dentistry of any officer, director, shareholder or employee not promptly removed or discharged by the corporation; (b) unethical professional conduct on the part of any officer, director, shareholder or employee not promptly removed or discharged by the corporation; (c) the death of the last remaining shareholder; (d) or upon finding that the holder of a certificate has failed to comply with the provisions of this Act [§§ 64–1801—64–1817] or the regulations prescribed by the Board.

The plaintiffs suggest that the Dental Board has specifically transgressed the bounds of its authority in promulgating regulations 5(c), 5(d), 5(e), 5(f), 12(i) and 13. They further contend that such activities lie at the heart of the antitrust conspiracy that has been directed against the plaintiffs. The Court finds these contentions utterly lacking in merit.

First, the Court finds ample support in the statute to uphold the Dental Board's authority to promulgate the challenged regulations. It is clear that the legislature

contemplated that the Dental Board's regulation of the field would extend to the promulgation and execution of the above-stated regulations.

Rules 5(c), 5(d), 5(e) and 5(f) all represent attempts by the Dental Board to define the term "Practice of Dentistry." The Rules therefore extend regulation to:

(c) Any person who shall offer to undertake in any manner to prescribe or make, or cause to be made, an impression of any portion of the human mouth, teeth, gums, or jaws, for the purpose of diagnosing, prescribing, treating, or aiding in the diagnosing, prescribing or treating, any physical condition of the human mouth, teeth, gums or jaws, or for the purpose of constructing or aiding in the construction of any dental appliance, denture, dental bridge, false teeth, dental plate or plates of false teeth, or any other substitute for human teeth.

(d) Any one who owns, maintains or operates any office or place of business where he employs or engages, under any kind of contract whatsoever, any other person or persons to practice dentistry as above defined shall be deemed to be practicing dentistry himself and shall himself be required to be duly licensed to practice dentistry as hereinabove defined, and shall be subject to all of the other provisions of this Section, even though the person or persons so employed or engaged by him shall be duly licensed to practice dentistry as hereinabove defined.

(e) Any person, firm, group, association, or corporation who shall offer or undertake to fit, adjust, repair, or substitute in the human mouth or directly related and adjacent masticatory structures any dental appliance, structure, prosthesis, or denture, or who shall aid or cause to be fitted, adjusted, repaired, or substituted in the human mouth or directly related and adjacent masticatory structures any dental appliance, structure, prosthesis, or denture.

(f) [Any person w]ho makes, fabricates, processes, constructs, produces, reproduces, duplicates, repairs, relines, or fixes any full or partial denture, any fixed teeth, any artificial dental restoration, or any substitute or corrective device or appliance for the human teeth, gums, jaws, mouth, alveolar process, or any party thereof for another, or who in any manner offers, undertakes, aids, abets, or causes another person so to do for another, without written prescription or work order therefor signed by the dentist legally engaged in the practice of dentistry in this state or in the jurisdiction where such dentist maintains his dental office and who prescribed and ordered same.

Without question, the statute explicitly provides for such regulations. As noted *supra*, section 72–543 broadly defines the term "Practice of Dentistry" and explicitly empowers the Board to promulgate regulations that further define the "practice of dentistry." The statute also supports the Dental Board's adoption of Rule 5(f) by requiring work orders or authorizations in connection with dental work. *See* section 72–545(B). The Arkansas Supreme Court has also given its sanction to the Dental Board's activities in this area. *See Hulva v. Arkansas State Board of Dental Examiners*, 277 Ark. 397, 642 S.W.2d 296 (1982).

The plaintiffs' attack on Rules 12(i) and 13 is also misplaced. Rule 12(i) defines "unprofessional conduct" as including:

(i) The use of any false, assumed or fictitious name, either as an individual, firm, corporation or otherwise, or any name other than the name under which he is licensed to practice, in advertising or in any other manner indicating that he is practicing or will practice dentistry, except such name as has been approved in writing by the Board.

Rule 13 provides:

**ARTICLE 13. Name of Practice**

Any person, association, partnership, corporation or group of dentists, engaging in practice under any name that would otherwise be in violation of Article 12, may practice under such name if, and only if, such person, association, partner-

ship, corporation or group holds an outstanding, unsuspended and unrevoked permit issued by the Board. The Board shall issue written permits authorizing the holder to use a name specified in the permit in connection with such holder's practice if, and only if, the Board finds to its satisfaction that:

(a) The applicant or applicants are duly licensed dentists.

(b) The place or establishment, or the portion thereof in which the applicant or applicants practice, is owned or leased by the applicant or applicants, and the practice conducted at such place or establishment, or portion thereof, is wholly owned and entirely controlled by the applicant or applicants.

(c) The name under which the applicant or applicants propose to operate contains the family name of one or more of the associates, partners, shareholders or members of the group. Fictitious or assumed names may not be used, however, other words which would denote the type of professional service being offered may be used, e.g., John Doe, D.D.S., Dental Clinic would be acceptable, whereas, Acme Dental Center would not be acceptable.

(d) All licensed persons practicing at the location designated in the application hold valid and outstanding licenses and that no charges of unprofessional conduct are pending against any persons practicing at such location.

Any permits issued under this Article may be revoked or suspended at any time that the Board finds that any one of the requirements for original issuance of a permit is no longer being fulfilled by the holder to whom the permit was issued. Proceedings for revocation or suspension shall be governed by the Administrative Procedure Act.

Reference to the underlying statutes reveals that the General Assembly contemplated the Board's regulation in this area and specifically authorized the Board to adopt rules and regulations in support thereof. *See* section 72–544 [13] ("Advertising ... shall not be fraudulent or misleading and shall be in conformity with rules and regulations adopted by the Board."). Indeed, the Arkansas Supreme Court recently upheld a contempt-of-court finding against plaintiff Barry Brazil after he violated an injunction regarding, *inter alia,* improper advertising. *See Brazil v. Arkansas Board of Dental Examiners,* 279 Ark. 41, 648 S.W.2d 476 (1983). The Board's implementation of this legislative mandate properly falls within state action immunity. *Cf. Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (advertising ban imposed by bar association under direction of Arizona Supreme Court held immune).

Similarly, sections 64–1802 and 64–1814 of the Dental Corporation Act indicate that a dental corporation may practice only under the names of those persons who are employed by the corporation and licensed to practice dentistry. Furthermore, section 64–1814, quoted *supra,* makes it clear that the State intends to restrict ownership, management and control of dental corporations to those who are licensed under the Act. The General Assembly thus *meant* to preclude mere denturists, acting in concert with licensed dentists, from owning or managing dental facilities such as that which the plaintiffs seek to run. Therefore, the Dental Board is well within its authority in adopting and enforcing the challenged regulations.

Plaintiffs also contend that the Dental Board has conducted a campaign against plaintiffs Barry and Patsy Brazil and Dr. Hinsley of bringing charges against them and persons associated with the American Denture Center, with the purpose of driving them out of business. The plaintiffs

---

**13.** Section 72–544's reference to section 72–543 suggests that any advertising rules are subject to judicial review. Indeed, as in *Bates,* for any enforcement actions brought pursuant to the advertising limitation, the Arkansas Supreme Court would be the ultimate trier of fact and law. *See* 433 U.S. at 350, 97 S.Ct. at 2692 (Arizona Supreme Court serves as the ultimate trier of fact and law).

suggest that this gives rise to antitrust liability. The Court must disagree. It is clear that the Dental Board is expressly authorized to seek to enjoin those persons who practice dentistry in violation of the Dental Practices Act. *See* section 72–542. Thus, when carrying out this "prosecutorial" role, the Dental Board is simply acting as the enforcement arm of the State. Without question, the State has indicated an interest in eliminating "competition" by those who are not properly authorized to practice dentistry. The Dental Board's execution of this policy clearly falls within the "state action" doctrine.

The Dental Board's requirement that work conducted by denturists or dental laboratories be accompanied by a written work order signed by a licensed dentist also gives rise to no antitrust liability. The statute clearly sets forth this requirement, *see* section 72–545(B), and the obvious consequence of this requirement is that denturists are prohibited from dealing directly with the public. *See Hulva v. Arkansas State Board of Dental Examiners,* 277 Ark. 397, 642 S.W.2d 296 (1982) (approving of the prohibition of the sale of dentures to the public by dental technician). Indeed, such a regulatory approach is not unique to Arkansas. The State of Kentucky has imposed such a requirement and it has withstood an antitrust challenge that is remarkably similar to that in the case at bar. *Gambrel v. Kentucky Board of Dentistry,* 689 F.2d 612, 618–20 (6th Cir.1982), *cert. denied,* 459 U.S. 1208, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983). This Court sees no basis for departing from the Sixth Circuit's finding in *Gambrel*.[14] The Dental Board's adoption and enforcement of the work order requirement is not prohibited under the Sherman Act.

To conclude, the State has both authorized the Dental Board to regulate the practice of dentistry (including the manufacturing and sale of dentures by denturists) and has done so with an intent to displace com-

petition. As observed *supra,* Arkansas has a long history of regulating the practice of dentistry. Indeed, it has regulated the field quite extensively. The General Assembly has effected expansive delegation of regulatory authority to the Dental Board with the intent that the Board limit the practice of dentistry to a select few. It is therefore clear that the General Assembly intended to displace competition. The Court consequently finds that the actions of the Dental Board and its officers do not give rise to liability under the Sherman Act. Plaintiffs' antitrust claims against the Board and its officers must therefore be dismissed.

### III. *Immunity of the Dental Association*

The nature of the plaintiffs' antitrust claims against the Arkansas Dental Association (Association) is somewhat more obscure. It appears that the plaintiffs may object, at least in part, to the Association's role in recommending candidates for membership on the Dental Board. *See* Amended Complaint ¶ 12. The Court finds, however, that this allegation must be dismissed.

It should be noted, of course, that the status of the Association is quite different from that of the Board. The Board is an administrative agency, authorized under state statute, whose power and duties draw their essence from clear legislative commands. By contrast, the Association is essentially a private entity.

Nevertheless, the Association's private status does not mean that it lacks *any* public characteristics. Indeed, the Legislature has expressly imbued the Association with at least one vital public function: it is the official recommending body for all appointments to the Dental Board. As Ark. Stat.Ann. § 72–535 provides:

* * * On September 1 of each year, or as soon as it is practicable thereafter, the Governor shall appoint a new member,

---

**14.** *Gambrel* employed the relatively stringent *Midcal* requirements. Although this Court believes that the *Midcal* test is not required as to

the Dental Board, the Court still finds *Gambrel* to be persuasive authority.

who has been first recommended by the Arkansas State Dental Association, to fill the then accrued vacancy on the Board .... * * * All vacancies which occur by reason of death, resignation, or in any other manner, except vacancies which occur by the expiration of the term of appointment, shall be filled by the Governor upon the recommendation of the Arkansas State Dental Association ... in the manner prescribed for the regular appointments to the Board ....

The Court has previously ruled that the Arkansas Dental Practice Act constitutes a clearly-articulated and affirmatively-expressed system of regulation that is designed to circumscribe competition in matters relating to the practice of dentistry. As an adjunct to the regulatory scheme, the Association is clearly vested with the responsibility of recommending candidates to the Governor for positions on the Board. Thus, the Association dons the mantle of the State when carrying out its recommendation function. It is consequently immune from Sherman Act liability in performing this function.

The Court has searched the plaintiffs' Amended Complaint for other bases on which to find further allegations of antitrust violations by the Association. The overall vagueness of the pleadings and the lack of further clarification in the briefs has stymied the Court's inquiry. Nevertheless, five basic allegations that implicate possible anti-competitive conduct by the Association may conceivably be inferred from a liberal reading of the pleadings. They are:

The Association has an interest in protecting the economic self-interest of its dentist members. Amended Complaint ¶ 9.

The Defendant, Dental Board, has *at the urging and with the approval of the Association,* sought to exercise regulatory control over dental laboratories and Denturists by interpreting the statutes

of the State of Arkansas in a manner contrary to the Constitution of the United States of America, and by passing regulations with regard to these laboratories which are unconstitutional and/or unlawful. They have done this with the collusion and cooperatrion of the Dental Society (sic) which recommends the members of the Dental Board. Amended Complaint ¶ 12 (emphasis added).

The State of Arkansas and Defendant, Dental Board and Association, have sought to protect the economic interests of dentists by requiring that any procedure undertaken by a dental laboratory be accompanied by a written work order signed by a dentist with a valid Arkansas license. Amended Complaint ¶ 18(a).

The State of Arkansas and the Defendant, Dental Board and Association, have further sought to protect the economic interest of dentists by prohibiting dentists from being employed by a dental laboratory or from being engaged in an ownership capacity in the operation of a dental laboratory with non-dentists. Amended Complaint ¶ 19.

All Defendants ... from and after April 1979, have entered into and are engaged in an unlawful combination and conspiracy to attempt to restrain trade in the provision of dental care services and to monopolize the marketing and distribution of such services. Amended Complaint ¶ 41.

Taking each of the claims in sequence, the first and second have no significance. The mere existence of an Association's interest in protecting the economic interest of its members, even when combined with extensive advocacy of such interest before the legislature, administrative agencies, or in some instances, the courts, escape antitrust scrutiny under the *Noerr-Pennington* doctrine.[15] This point was fully recognized by the Supreme Court in *New Motor Vehicle Board of California v. Orrin W. Fox Co.,* 439 U.S. 96, 110, 99

15. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Mine Workers v.* *Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965).

S.Ct. 403, 412, 58 L.Ed.2d 361 (1978) (automobile dealers who seek ban on competitors from state agency empowered to regulate the establishment of dealerships do not violate the Sherman Act), and more recently by the Eighth Circuit in *First American Title Co. of South Dakota v. South Dakota Land Title Ass'n,* 714 F.2d 1439, 1445 (8th Cir.1983), (The Sherman Act is generally inapplicable "to joint efforts by groups seeking to exercise their first amendment right to petition the government whether it be a petition to legislature, an administrative agency, or the courts" even if they intend to eliminate competition), *cert. denied,* —— U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). *See also California Motor Transport Co. v., Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972). Similarly, under facts almost identical to those at bar, the Sixth Circuit in *Gambrel v. Kentucky Board of Dentistry,* 689 F.2d 612, 620–21 (6th Cir.1982), *cert. denied,* 459 U.S. 1208, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983), found that the *Noerr-Pennington* doctrine would preclude liability for the Kentucky Dental Association and individual dentists who lobbied "the state legislature against any proposed changes in the law and [lobbied] to encourage the Board of Dentistry to enforce the state law...." *Id.* at 620. Thus, the Court believes plaintiffs' antitrust claims based on these allegations must be dismissed.

The third allegation is closely akin to the first two. It appears that any liability would have to arise out of the Association's involvement in the adoption of the work order requirement. The complaint and the briefs contain no elaboration on how the Association is supposed to have been involved in the establishment of this requirement. It is possible that the Association has lobbied for its adoption and/or its retention. In either event, such activity would constitute protected first amendment activity that is immune from antitrust liability. Parenthetically, the Court must note that in reality the Association has no authority to "require" adherence to the written work order rule. To the extent

that it or its members adhere to or advocate adherence to the statute and the regulations adopted thereunder, such activity would clearly be immune from liability under the *Midcal* rule: the restraint is "clearly articulated and affirmatively expressed" in the statute; furthermore, the statute not only *authorizes* dentists to comply with the work order requirement; it actually *compels* it. Any allegations that the Association has encouraged its members or others to refuse to deal with denturists unless the statute and regulations are complied with is exempt from liability under the Sherman Act. *See Gambrel,* 689 F.2d at 619 (dentists' refusal to give work orders directly to patients so that the patients might deal directly with dental technicians "is compelled by the statute itself and therefore exempt under the antitrust laws.").

The fourth allegation is also related to the third in that it contends that the Association has played a role in prohibiting dentists from being employed by a dental laboratory or engaged in the ownership of a dental laboratory with non-dentists. Again, the plaintiffs have asserted no facts that would indicate that the Association actually plays a role in carrying out the prohibition. At most, it appears that plaintiffs' claim would have to stem from the Association's advocacy of or adherence to such a rule. The Court believes that the *Noerr-Pennington* doctrine would insulate any lobbying efforts from antitrust scrutiny. Moreover, any efforts by the Association to induce its members *not* to join with "denturists" in the operation of a dental laboratory constitute nothing more than an attempt to obtain compliance with the law of the State of Arkansas. There can be no Sherman Act liability under such a situation.

The plaintiff's last allegation—that the Dental Association has engaged in a combination and conspiracy in an attempt to restrain trade and monopolize the field—presents a closer issue. The dearth of any detailed fact-pleading makes it difficult to understand fully the basis of the plaintiffs'

allegation. Nevertheless, the Court notes that irrespective of the Association's immunity for certain actions under state action and *Noerr-Pennington* doctrines, there *could be* other activities that might support an antitrust cause of action. From the current state of the pleadings, the chances of such an antitrust claim surviving a motion for summary judgment (after the factual basis of the allegation has been established) appear slim. The Court is not, however, prepared to say at this stage that, based on its last broadly-stated allegation, the plaintiffs failed to state a claim upon which relief could be granted.

## IV. *Order*

It is therefore Ordered that the motion to dismiss plaintiffs' antitrust claims filed by the defendant Dental Board and its members, be, and it is hereby, granted. It is further Ordered that the motion to dismiss plaintiffs' antitrust claims filed by defendant Dental Association and its officers be, and it is hereby, granted in part and denied in part, as set forth above.